MOORE v. COLUMBIA, &c., RAILROAD COMPANY.

1. RAILROADS.—The status, rights, and obligations of railroad corporations, stated.

2. PASSENGER WITHOUT TICKET—FARE.—Where there is a ticket office, and it is kept open for the sale of tickets to passengers for thirty minutes before the train leaves, the passenger who boards the train without having purchased a ticket, is liable, under the laws of this State, to pay the ordinary fare and twenty-five cents additional.

3. IBID.—IBID.—EJECTION.—If the passenger neglects to purchase a ticket, and also refuses to pay, he is not entitled to transportation for any distance; if his neglect to purchase was intended as a fraud on the rights of the corporation, he is also liable to a forfeiture. Gen. Stat., § 1517. In both cases, the conductor should enforce the payment of the fare, and, on refusal, use so much force as is necessary to eject the passenger from the train when stopped.

4. IBID.—RULE OF COMPANY.—After refusal by a passenger to pay the legal fare demanded by the conductor, there is no contractual relation which would entitle the passenger to be carried to the next station, under a rule of the company, if such a rule was found to exist.

5. TRESPASSER ON TRAIN.—One who enters a railroad passenger coach without a ticket, becomes, on refusing to pay his fare, a trespasser *ab initio.*

6. IBID.—IMMATERIAL ERROR.—The charge of the Circuit Judge, as a whole, in this case, on the right of a railroad and its conductor towards a passenger who refuses to pay his fare, approved; and his declaring that such conductor had the rights of a trial justice, when he should have said "constable," worked no harm in the connection in which it was said.

7. ASSAULT BY TRESPASSER—DEFENCE BY CONDUCTOR.—A conductor may eject a trespasser from the train, and in doing so may use such force as is necessary. While so acting, the conductor may resist assault, meet force with force, and continue to strike until danger to himself is averted; and the jury should not nicely weigh the greater injury inflicted in such resistance, as the conductor would not be liable unless the injuries inflicted by him were greatly disproportioned to the assault, or were done wantonly and maliciously.

8. TRESPASSER—PLACE OF EJECTING.—The conductor may put off a passenger, who refuses to pay the fare for transportation, at any point of the road where the passenger would not be injured or endangered.

9. RAILROADS—ACTS OF EMPLOYEES.—A railroad company is answerable for the results of acts of its employees only when such acts were done while in the discharge of their duties as employees.

10. RULE OF RAILROAD COMPANY—CHANGE IN RULE.—A passenger on a railroad train who refused to pay his fare, and was put off between stations, cannot complain of the place of his ejection, because of a printed rule of the company requiring conductors to put such trespassing passengers off at the next station, where the unobjected to testimony of the conductor was, that he was required by law and by the orders of his superiors to eject such a passenger without delay.

11. CHARGE ON FACTS—TRESPASSER.—A judge may not convey to the jury his opinion as to any material fact at issue between the parties, but there was no error in stating to the jury the undisputed facts, that the defendant, on failure to pay his fare when demanded, refused to leave the train, and on being ejected, attempted to board the train, and, as matter of law, that this conduct was unlawful.

12. IBID.—In stating to the jury the testimony in its logical order, so as to make clear to the jury its bearing upon the legal questions involved, the trial judge did not charge upon the facts.

13. IBID.—IMMATERIAL ERROR.—A misstatement of facts to the jury, as to the point of time when an injury was received, which was an immaterial matter. is not ground for a new trial.

14. JUDGE AND ATTORNEY—INTERRUPTIONS.—Counsel arose at the conclusion of the judge's charge to the jury, for the purpose of making a correction, but the judge saying; "I can't hear argument, but if you have any request,"

counsel remarked, "I have nothing more to say, sir," and took his seat. *Held*, that counsel not having further insisted, he cannot complain.

Before HUDSON, J., Richland, April, 1891.

This was an action by David Moore against the Columbia and Greenville Railroad Company, commenced February 27, 1889. The opinion fully states the case.

*Messrs. Andrew Crawford* and *Melton & Melton*, for appellant.

*Mr. B. L. Abney,* contra.

November 18, 1892. The opinion of the court was delivered by

MR. JUSTICE POPE. This action came on for trial in the Court of Common Pleas for Richland County, at the spring term of said court, in 1891, before his honor, Judge Hudson, and a jury. The plaintiff complained of the defendant, that on the 9th day of February, 1889, he was ejected from the railroad train operated by defendant, at about one mile distant from Alston, in the direction of Columbia, after he had tendered to the conductor who had charge of such train the usual fare required of passengers for being transported between the stations of Alston and Wallacevllle; that in causing his ejection from such train by defendant's agent, he was brutally, wantonly, and mercilessly beat, bruised, and wounded in a most shocking and cruel manner, without cause or provocation, and in violation of his rights. He demanded judgment for the sum of ten thousand dollars and costs. The answer of the defendant consists in a general denial.

The testimony for the plaintiff tended to establish, that plaintiff, who resided near the station on defendant's road named Wallaceville, a flag station, had gone up to Alston on defendant's road on the morning of the 9th of February, 1889, on business; and on his return to Wallaceville on that afternoon, he had entered the first passenger coach of defendant, and when the conductor, Mr. Hughes, had demanded his fare, had offered him the sum of fifteen cents therefor, that sum being the amount

he had paid in the morning in going from Wallaceville to Alston, but that the conductor rudely refused to receive that sum, demanding twenty-five cents additional; and that the plaintiff refused to pay the additional sum, whereupon the conductor, in a rude, angry, and disrespectful manner, ordered him off the train. Conductor said: "Will you pay me the forty cents or get off the train?" He said: "I will not do it." Conductor said: "You get off the train." He said: "I will not do it." Conductor then said: "I will put you off," and pulled the bell cord and stopped the train. Then, after some words between the two, the conductor endeavored to lead him out, but he would not go. That ultimately the conductor, the baggage master, and porter seized him rudely by the hands, feet, and body, and carried him out of the cars, striking his shoulder violently against the corner of the ladies' saloon. This violent handling culminated in pitching him headlong down a bank some ten or twelve feet, his shoulder striking the ground and also his knee. That afterwards, in his efforts to get on board of the train a second time, his hand was mashed so that his thumb was broken. That in his effort to get on board a third time, his head was bruised and beaten by the conductor striking him with metal knucks. That being left in this condition, by the aid of a colored man he was assisted to his home at Wallaceville; but after reaching that place, he proceeded by a freight train to Columbia, in order to have medical attention. The statement of the plaintiff as to the treatment he received after being ejected from the car, was substantially corroborated by a colored man, King Franklin. Another witness on the train, George A. Setzler, confirmed his statement as to being struck by the conductor, in his effort to get upon the train while in motion. The character of his bodily injuries was testified to by Dr. L. K. Philpot, Dr. Samuel W. Melton, Capt. J. L. Little, John Hardy, Thos. R. Davis. The plaintiff testified that his shoulder was dislocated, his thumb broken, and in consequence thereof he has never been able to do much labor since that time.

For the defendant, the following witnesses testified: L. D. Breneke, R. E. Nooe, L. J. Watson, D. S. Lambert, T. S.

Moorman (who were passengers at the time); Conductor O. E. Hughes and Baggage Master Winn, as to the details of the difficulty. These witnesses gave an entirely different version of what occurred. Substantially they agreed in their statements, and these are about the facts testified to: That on the 9th February, 1889, when the conductor, in a polite and proper manner, called for the ticket of the plaintiff, he was informed by him that he had purchased no ticket, but offered to pay fifteen cents for his passage on the train; that the conductor politely informed him that the fare was forty cents; that the plaintiff rudely declined to pay it, whereupon the conductor told him that he must leave the train, to which announcement the plaintiff at first assented, but soon afterwards said he would not do. That the conductor brought the train to a stop, and then said to the plaintiff to get off, but plaintiff cursed and said he would not; when the conductor tried to lead him out, he resisted, and then the conductor called to his aid the baggage master, Winn, and the colored porter. That these three had the utmost difficulty in removing plaintiff from his seat in the car, and that in the effort to unclasp his hands from the seat, the baggage master, Winn, strained some of the tissues of the muscles of his arm so that he is permanently disabled. That the plaintiff in being moved from the train exerted all of his powers to prevent such removal, pushing the conductor and his assistants about, pushing the baggage master to the floor, and falling on him, catching hold of the seats as he passed, planting his foot against the door of the car, and when on the platform, on the way out, he seized the iron railing, kicked the conductor in the belly, hurling him down the bank, and when on the ground assailed the conductor with some bridles held in his hand by striking him over the head with them. That plaintiff was pushed down the bank of the railroad track after he had committed these acts of violence. That when the train was started again, he tried to enter the train, and his hands were only loosed when the foot of the baggage master pushed his hand. That again the plaintiff attempted to get on the train, and because the conductor forbade him, he struck the conductor over the head and shoulders with the bridles he held in his hand; and that as the train

left him, he shook his fists at the conductor. That the con-
ductor, when he was struck with the bridles, struck plaintiff
several blows with metal knucks.

Questions were raised, and testimony was introduced, by the
plaintiff from the printed rules of the defendant company, re-
quiring conductors, upon the refusal of passengers to pay fare,
to put such passengers off at the next station.   The defendant,
in reply, introduced testimony to the effect that the statute law
of the State required that passengers who refused to pay fare
might be ejected from the train at once thereafter.   That under
the law three cents a mile was the regular fare upon tickets
purchased, but that in case a passenger could buy a ticket and
neglected to do so, an extra charge of twenty-five cents should
be collected from such passenger.   And it was in testimony
that the defendant's ticket office at Alston was open all day
long on the 9th February, 1889.   But the conductor testified,
without any objection being made, that it was his instructions
from the defendant to put passengers off without delay when
they refused to pay.

The plaintiff made no requests to charge of the Circuit
Judge.   The defendant did make such requests to charge.

The presiding judge made the following charge to the jury:

"Gentlemen of the jury:   *   *   *   This action is brought
by Mr. David Moore against the Columbia and Greenville
Railroad Company to recover damages for an alleged wrongful
ejectment from the train of that company, on the 9th of Feb-
ruary, 1889, and for the infliction of cruel, wanton, and unusual
punishment by the conductor and members of the crew.   You
will bear in mind that you occupy the position of judges of the
facts of this case, whilst to me is assigned the duty of expound-
ing to you the law.   *   *   *   You have no other duty to per-
form except to pass upon the facts after you have applied to
those facts the law as I will expound it to you.   If I should
err in expounding the law, you, following that error, will not
be responsible, but my error will be corrected by a higher tri-
bunal.   The law, as I give it to you, is obligatory upon you;
the facts, as you find them from the testimony of the witnesses
upon the stand, you are responsible for—I mean, you are re-

sponsible for the finding.   The plaintiff in this case is a private citizen of Richland County,   *   *   *   the defendant is a railroad company, a corporation; and you are not to be biased or influenced by any prejudice in favor of the corporation and against the plaintiff, if any should possibly exist; nor are you to be influenced in the slightest degree by any possible prejudice against the defendant and in favor of the plaintiff.   All such feelings are to be cast aside, and you, under oath, are to render your verdict according to the law and the testimony. *   *   *   You are to take the testimony as you hear it here, and not as it may be presented by counsel, if that presentation is inconsistent with the language of the witnesses.

"By counsel for defendant, certain requests to charge have been submitted.   I will first pass upon them, and then deliver to you my instructions, according to my understanding of the law : '1st. That if the jury believe that the plaintiff got upon defendant's cars at Alston, a station on the defendant's railroad, on the 9th February, 1889, to go from said station to Wallaceville, another station on defendant's road, and that said station at Alston was a regular station upon defendant's road, where defendant had an office for the sale of tickets to passengers over its line of road, and that said office was on said day open not less than thirty minutes before the time fixed for the departure of the train upon which the plaintiff proposed to travel, and they further believe that the plaintiff neglected or refused to purchase a ticket at said station, and if they further believe that such train was not an accommodation train, then, under the laws of this State, the defendant company had a right to charge twenty-five cents extra to the fare for a ticket sold at that station, provided the fare was less than $2.50, and such sum for which a ticket was sold was not more than three cents a mile.'   I charge you that is correct, that is the law.

" '2. And that if they believe the plaintiff, upon the demand of the conductor for the fare for a ticket and the extra twenty-five cents, refused to pay the extra sum, then the defendant had the right to eject from its cars the plaintiff at any place where such refusal took place, provided expulsion at such place would not subject the plaintiff to bodily harm and peril;

and upon such refusal, to use such force as was proper and necessary to put the plaintiff off the train.' I charge you that is correct, that is the law.

" '3d. If the jury believe, from the facts of the case and the instructions of the court, that the conductor had the right to demand the extra sum of twenty-five cents from the plaintiff, and that upon his refusal to pay it, the conductor had a right to eject him, the plaintiff became a trespasser, and it was his duty to go off the train without being forced to do so. And if the jury believe that the plaintiff resisted the conductor in discharge of his duty, and in such resistance he received personal injuries, which were the direct and necessary result of the application of force rendered necessary by his own resistance, he cannot recover for such injuries.' I charge you that is good law.

" '4. In determining the question in this case as to whether the trainmen on the train from which the plaintiff was ejected used more force or violence than was necessary to be used in ejecting plaintiff from such train, the jury are to take into consideration the amount of resistance offered by the plaintiff to such ejection; and if they find that he resisted the attempt of the conductor to put him off such train, with all the force and power he was capable of using, then, and in such case, the law will not, with a nicety, weigh the amount of force necessary to be used in overcoming such resistance, and that in such case the defendant would only be liable in a case of palpable and perfectly apparent use of force beyond that which was clearly necessary to be used in overcoming the resistance offered by the plaintiff; and that the railroad company can only in such case be made responsible for the injuries inflicted which were wilful, wanton, or malicious, because by resisting to the utmost of his power and ability, the plaintiff invited force—he ought not to complain of the force used, if there was no intention upon the part of the conductor or his assistants to commit unnecessary injury.' I charge you that is good law.

" '5. That if the jury believe that, after the trainmen had put the plaintiff off the train, he attempted to get upon the train for the purpose of assaulting the conductor, and did, in fact, strike him, he committed a breach of the peace; and if in re-

turning such blow the conductor seriously injured the plaintiff, the defendant is not liable for the act of the conductor, if the jury further believe that such act was not done to carry out any of the purposes, rules, regulations, or directions of the defendant, and that it was not within the scope of his employment.' That is, in general, in its main features, a correct proposition of law; probably I will modify it somewhat in my general charge.

" '6. That if the jury believe that, after the plaintiff had been ejected from the train, he voluntarily entered into a conflict with the conductor and brakeman, and brought upon himself the injuries which he complains of, he cannot recover from the defendant, and if they further believe he was the original aggressor, and brought upon himself the injuries of which he complains.' That is correct.

" '7. That the conductor of a train has the same right as any other citizen to defend himself against the assaults made upon his person, and if in such defence he uses more force than is necessary, the railroad company is not liable therefor, unless such act was done wilfully, wantonly, and maliciously, and while performing his duties as a conductor within the scope of his employment.' I charge you that is correct law.

"Now, gentlemen, I have endorsed these requests to charge by the few short remarks I have made at the end of each; but the exact phraseology of some of these requests to charge may be modified, qualified, or explained by the general charge which I will give you. It is well and necessary, in determining cases of this kind, that you should have a clear understanding of what life upon a railroad train is, what the duties of the railroad employees are, and what are the duties of the citizens on these railroad trains. A good deal has been said in regard to the regulations of the railroad company; and it is claimed on one hand that these railroad regulations constitute the law of the land, and in so far as the regulation has a bearing upon the case at issue, that it constitutes the law of the case. Such is not my view of the railroad regulations; these are not the secrets of the Star Chamber, as they have been styled by the counsel for the plaintiff. These are not public

laws, but these are the instructions, the rules laid down by the railroad company for the guidance and government and control of its employees.   Their object is to inform employees of their particular duty, and to exact of them the performance of that duty.   The object of the rule is for the wholesome, wise, and proper conduct of these officers in the discharge of their duties to the company as well as to the public.   In these regulations you will find there are rules laid down for the government of conductors, ticket agents, freight agents, trainmen, baggage agents, switchmen, and all the various employees of a railroad company; and, as I say, the object of the rule is to inform those men of that which is required of them, and to exact a faithful observance of them towards the company and towards the public, in so far as the public are affected by them.   But the law of the land is that by which railroad companies are to be governed, and if any rule here [referring to the company's rule book] is in accordance with, or consistent with, the law of the land, it is a good rule, or, in other words, it is a lawful rule; but if there be any rule laid down here which is inconsistent with the law of the land, at variance with it, not coming up to the requirements of the law, why, it is the law that governs the company in the discharge of its duty towards the employees, and the employees toward the company, and all towards the public.

"This case, as every other case before a jury or before the court, is to be tested by the law of the land; that is what we are to be governed by.   If the rule is consistent with that law, it is nothing but the law; if it is inconsistent, the law prevails and the rule goes down.   These rules are liable to be changed at any time.   The company must look to the wisdom of the rule and consistency with the law when it enacts or changes it.   These rules are instructions for the guidance and control of those through whose instrumentality the affairs of the company must be conducted.   A railroad company is what is called a quasi public corporation; it owes duties to the public, and those duties arise out of the fact that it is a common carrier of passengers and of freight, and as such it owes duties to the public, and it is styled in the law books and in the laws a quasi

public corporation; but it is a corporation composed of private individuals, who invest their money and their labor in these enterprises, the object of which is to convert that money into an investment, and make it profitable to those who thus invest their funds.    And whilst it is composed of private individuals, who, for the very purpose of making a profit, invest their money in the concern, yet they constitute a corporation which owes a duty to the public as common carriers of passengers and freight.    It is the duty of the company to have in its employment good, honest, efficient, careful, watchful employees; that is a duty it owes to the public—one of the duties.    It is the duty of the company to see that these employees discharge their respective duties to the company and the public in a proper way.

"Now, a railroad passenger train is for the carrying of passengers, the public; and upon it all citizens, of all ages, conditions, classes, colors, all are liable to be carried, and have a right to be carried; and it is the duty of the conductor, representing the company, to conduct himself in a polite, kind, observant, considerate manner towards those who are under his care.    It is necessary that good order should be maintained on the train, and that the passengers should be carried in comfort and in peace; and so regardful is the law of the duties, those imposed on the captain of the crew, the conductor, that our own law has invested him with the rights and duties of a trial justice.    In certain emergencies he is an officer of our law as well as an officer of the company, the object of which is to give him the power to enforce order, to enforce discipline, to have peace, to have quiet, and thus to protect passengers of every kind, of every grade, color, and condition in society.    It is important that they should have a good conductor—one who is prudent, one who is discreet, and at the same time a conductor who is equal to every emergency.    He must be a man of firmness—he must have the will, the moral courage and physical courage, to discharge his duty towards all the passengers, and maintain order and quiet; and no one who has traveled upon a railroad train would fail to observe the fact that a conductor who will do his duty in this way, who manifests it to the passengers,

inspires the passengers of that train with a feeling of security, a feeling of respect; while the conductor who has not the moral courage or the physical courage, but who is a puny, trifling man, who would suffer his passengers to be disturbed and run over by rowdies and by violence, would inspire contempt on the part of his passengers, to say nothing of increasing their feeling of insecurity.    It is a sacred place in the eye of the law aboard a train, where passengers from abroad as well as at home have to travel at all hours of the day and at all hours of the night; ladies alone, ladies with children alone, unattended by any protector, children without parents, all these are under the protecting care of the conductor, and the law invests him with the power, and imposes upon him the duty, to protect them. These are our highways.    It is too late in the day now to think of the transportation of persons and of freight to be done by any more inefficient means than that of the railways.    They are necessary to commerce and to the development of the country.    The railway is demanded by all the requirements of commerce and of the business life of our people.

"Now, whilst the company, and the officers of the company, have their duties to perform, and are held up to the strictest line of duty by the most stringent provisions of our statute, at the same time the people have their duties, also, to perform as passengers aboard a train; and it is just as much the obligation of the citizen to be quiet, orderly, peaceable, and respectful there as it is he should be in society; and, in fact, more so, because disorder upon a train traveling through the country at a rate of from twenty-five to forty miles an hour is a more frightful thing than disorder in the quiet walks of life upon the land.    Hence it is, that the law is so stringent in holding these companies up to the full measure of care and diligence, promptness and vigilance; hence it is, the law requires of all citizens the strictest obedience to, and observance of, the rights and privileges of the company and the employees of the company.    Now, the events, the transactions, the acts, out of which grew the present contention, have been narrated to you by the witnesses, eye-witnesses, and you are the judges of that testimony.    You have the testimony of the plaintiff, and the wit-

nesses put up by the plaintiff; you have the testimony of the alleged offender, the conductor, and the witnesses put by the defence, in addition to the conductor.   You are the judges of the facts.   You have the testimony to weigh, and, in weighing the testimony, you will take into consideration the relative position of the parties who have testified and the persons who are disinterested.   When you weigh the testimony of the plaintiff, who has testified in his own behalf, you give to it such consideration as, under the circumstances, in your judgment, it is entitled; and when you weigh the testimony of the conductor, you give to that such consideration as, in your judgment, it is entitled.   The credibility of these witnesses is altogether for you.   I have no right to comment upon that testimony, no right to charge you upon the facts; my duty is to expound the law, and, in expounding the law, to state the facts sufficiently for you to understand the law as I have expounded it.   I cannot relate the testimony *verbatim;* I can only give you the main features, the substance of it.   And in what I am about to say, you must not understand that I intend to allege that any one fact is proven—not at all; I only state what the witnesses testified to, the substance of that testimony, and you are to find what the facts are.   Hence, I would not have you misled in the slightest degree by anything I say by way of reciting the testimony.   It is possible I might make a mistake.

"The testimony of the plaintiff, in substance, is this: On that morning he got on at Wallaceville, upon an accommodation train, and went to Alston upon a matter of business, having but recently settled at Wallaceville; that he spent the better part of the day at Alston; in going on the accommodation train, he paid, from Wallaceville to Alston, fifteen cents, and bought no ticket; in returning from Alston to Wallaceville, he boarded the passenger train, and that passenger train he had the right to go upon, because it is for the carrying of all, and when he got on it he was a passenger.   It was not necessary, in the eye of the law, that he should buy a ticket in order to constitute himself a passenger; but when aboard he was a passenger until he, by proper proceedings, should cease to be a passenger, or until he forfeited the right to be a passenger.   He got no ticket;

was at Alston during the day, spent money around there, and had the opportunity, ample opportunity, to get a ticket. He testifies that he forgot, or neglected, or didn't think of it. After leaving Alston, going, perhaps, a mile (the distance you are to be judges of), the conductor, Mr. Hughes, called upon him for his ticket, he says, in a very abrupt manner; he offered him fifteen cents, the fare from Alston to Wallaceville. The conductor told him that he would have to pay forty cents; this he declined to do, whereupon the conductor informed him that he would have to put him off. He then told him he would have to put him off. The conductor stopped the train, took him by the arm, and told him to get off—"Now, get off;" the plaintiff, Mr. Moore, refused, and told him he would have to put him off, and resisted the conductor as he took him by the arm, and refused to yield to the effort on the part of the conductor to remove him; whereupon the conductor went in the adjoining car, and came back with two of the crew, a colored man and a white man, who is the brakeman or baggage master—baggage master, I think—you remember better than I do. Mr. Moore then refused to get up; they laid hold of him, and, according to his own testimony, he resisted all that he could to prevent them from getting him up; they had to lift him, as Mr. Moore says, off the seat, and carry him out by main force, Mr. Moore stating that he was resisting all he could to prevent this, and that as they passed the saloon he was bumped against it; that when he got to the door, he planted his foot against the facing of the door, and they had to use sufficient violence or effort to get him through the door; after he got through the door, and they were taking him down the steps, he laid hold of the iron railing to prevent them from putting him out; that after they got him out, they threw him down the embankment; that he came back; that then some one threw out his bridles; he picked up the bridles, threw them on the platform, and laid hold of the railing to get in again, and made an effort so to do, whereupon he was seized and thrown that time down the embankment under a hurricane root, and badly hurt; the train started off; he then rose from his position, made for the train again, went to the rear end of

that same passenger coach, laid hold of the railings with both hands, as he says. His testimony is, that in the fall down the embankment, his shoulder was dislocated; that in pushing off, when he made the second effort, that a kick, or a pressure of the foot—a kick—had broken his thumb, if his statement be true, and the train going off and in motion; he, in this bleeding condition, laid hold of the railing of the rear end of the car, whereupon the conductor appeared upon the platform, and as he leaned back, endeavoring to avoid the blow, he was stricken by the conductor with metal knuckles, and knocked off; that the train then went on, and that he was there in that bruised condition, and was conducted home by a colored man, who came up.

"Well, now, let us apply the law to that much of the case—to Mr. Moore's testimony. When Mr. Moore refused to pay the conductor's fare when called upon so to do, and announced his purpose not to leave the train, he committed an error; he was just then a wrong doer. For I instruct you that the conductor not only had the right under the law, the statute, but, under the instructions under which he was acting from the company, it was his duty to demand extra fare; so that, in demanding it, he did nothing but obey the law—I mean, complied with the law of the land, and obeyed the instructions of the company; and when Mr. Moore refused to pay that extra fare, announcing his purpose not to leave the train until he was ejected, he then subjected himself to the right, as well as the duty, on the part of the conductor, to eject him; and the conductor had the right under the law to use just so much force to put him out of that car as was necessary.

"But, before proceeding any further, I will notice the position taken in regard to the place where he should be put off. Regulation No. 146 in this book has been read, which instructs the conductor, when one is found without a ticket, or that which is tantamount to being without—if he has an unlawful ticket—that he shall be ejected at the next station. That is a wise rule, and it is a rule in the interest of humanity; but it was never intended to apply to one who gets on at one station and is to get off at the next, whose trip is so short; because,

if it applied to cases of that kind, a man could travel from here to San Francisco without paying one dollar of fare; because, as he starts from one station, the train having gone on, the conductor would only have the right to put him off at the next station ; being put off at the next, he would wait for the next train, and, by making station by station, could cross the continent and not pay a cent. These rules are not the law of the land; but they are the counsel, advice to, and requirement of the employees of the company. Now, in this case, I instruct you as a matter of law, that the conductor had a perfect right, under the law, and was, in the discharge of his duty towards the company, in duty bound to put this passenger off, who became a recalcitrant in thus refusing; that he had a right to put him off just at that point, provided at that point it would not be subjecting him to any inhuman treatment—for instance, like putting him off in a pond of water, or like putting him off in a dangerous swamp, or putting him off on a dangerous trestle; with the exception of that, he had the right, it was his duty, to put him off when he did—I say, with that qualification. The testimony is before you as to the nature of the ground, the place, and you have no evidence that it was a place the putting the defendant off at which would subject him to any of the hazards that I have mentioned, neither was it in the night time.

"Well, having the right, and it being his duty towards his company, to eject the defendant, it was the defendant's duty, when requested, to leave the car without subjecting himself to the force and violence that he has narrated to you himself. Now, once having been put off the train, it certainly then was the duty of the plaintiff to remain off; and if he were lawfully put off, it was his duty to stay off. He had no right to attempt to board the train by violence again ; and if he attempted to do so, he subjected himself to just as much violence or as much force on the part of the conductor and his crew as was necessary to prevent him from thus a second time boarding the train, he still being, according to his own testimony, in a state of refusal to pay the fare, deeming it to be his right to ride for the fifteen cents. If you find that to be the fact, there was the

second violation of the law on the part of the defendant, and they had a right to use force necessary to prevent him from getting on. If any unusual, cruel punishment had been wantonly inflicted on him, then it would be unlawful; but you are to say whether his being thrown down the embankment at the place and in the manner he was, was treatment of that kind. You have an idea of the width of the railroad track and the width of the dirt bed where these embankments are, and whether in a struggle of that kind, with great force or force enough to disengage him, his being thrown down or tumbled down that embankment, was unnecessary violence. Having been thus twice, you might say, ejected—once ejected and the second time prevented from boarding the train by force, the train moving on, he being thrown down by a hurricane root— he rose again and, according to his own testimony, with a determination to get on that train, a great desire to get on that train, he made an attempt at the rear end of the car, the car being in motion, he himself disregarding that fact; whereupon the conductor went to the platform to prevent him (and the conductor had a right then to use force sufficient to prevent him from making a violent invasion, a forcible invasion, of the train).

"I have spoken of the unlawful conduct of the plaintiff in these three instances. Now take the testimony of the conductor; his testimony is that plaintiff had to be lifted with great force out of his seat; that he had to be carried by force through the car, resisting all the while, and that sometimes the parties carrying him, one would be down or Mr. Moore down, and that it was a struggle in getting him to the door; and at the door he continued his resistance, and did, when he got on the platform and when the conductor got out on the ground, give him a violent kick in the stomach, which sent him part of the way down the embankment. * * * But I say that if he voluntarily planted his foot against the stomach of the conductor, and gave him such a push as to send him part the way down the embankment, he then committed an assault and battery upon the conductor, who was doing only that which the law gave him the right to do. Now you have the testimony of what transpired

out there—you have it from the passengers who were aboard, those who have no interest in the event of this suit one way or another; then you have the testimony of the conductor, and that of the witnesses for Mr. Moore, as to what transpired when he made the third attempt or second attempt, after having been once ejected, and the testimony as to the blow which the conductor gave him.

"If you should find from the preponderance of the evidence that the plaintiff, Mr. Moore, made that second attempt to board the train, and that he did, when the conductor appeared upon the platform, commit an assault and battery upon the conductor, why I instruct you that the conductor had a right to protect his own person as well as to protect the train from the unlawful invasion of the plaintiff. It has been contended by counsel for the plaintiff, that a conductor being an officer of the law, and having the high responsibility of the train and the passengers under his care, must be exceedingly cautious, he must be exceedingly forbearing. That is very true; but to say that a conductor has no right to defend himself against an assault and battery unless that assault and battery should threaten him either with death or serious bodily harm, is not good law. He has the right to defend himself against an unlawful assailant as much as any citizen of the land. He is not required to wait until he is threatened with serious bodily harm or death, but he has the right to defend himself; he has that personal right which his office does not deprive him of. Your governor, or any officer of your State, however high or dignified or responsible the office may be, is not thereby deprived of citizenship, is not divested of the right of a citizen to defend himself. Not at all. He possesses the same right to resist personal violence as any individual has. A conductor has the same right. Where a conductor wilfully, wantonly, cruelly, or outrageously inflicts an injury upon a passenger in the discharge of his duty as conductor, the company, of course, would be responsible for his wrong action; but if the conductor is, in what he does, discharging his duty, protecting the passengers and the train from the wrongful invasion of one who has no right to be upon the train—if a fight should ensue, and the conductor in that fight

should get the better of him, inflicting upon the party, thus assaulting and fighting him, an injury that was serious, why, he who is the aggressor, he who brings the violence upon himself, he who caused this trouble, who forced it, has no right to resort to a court of justice, and to ask at the hands of a jury of his countrymen damages, or compensation for the damages he has brought upon himself.

"Now, I am giving you this in the abstract. I do not say that the plaintiff did it; but I say that when that does occur, that a party who is in the wrong, and who not only is in the wrong and making himself a trespasser, but becomes violent and commits an assault and battery upon a conductor, if the conductor returns the assault and battery, and goes, perhaps, a little further than persons coolly studying about the matter would think that he should go, why, he who brings the trouble upon himself has no right to come to a court of justice and ask damages at the hands of a jury for injuries of which he himself is the author. Just as has been illustrated, if one, who is wrongfully in your house, if you request him to leave, and he, refusing, requires you to use force to put him out, and you, resorting to so much force as is necessary to put him out, succeed in getting him out, and he then, in a violent manner, attempts to come back, and forces you to resort to force to keep him out, and makes another attempt to return, and in addition to that commits an assault and battery upon the peaceable, law-abiding owner of that house, and a fight ensues, and the party thus trespassing and violating the law gets the worst of it, he cannot ask a jury of his countrymen to give him damages for the injuries thus inflicted.

"Whether, in this case, any assault and battery was committed upon the conductor, is a question for you. If it was committed, what kind, what was the nature of it? is a question for you. The blow the conductor gave, and the extent of the blow, and whether, under the circumstances, under the law as I have expounded it to you, it would be excusable or not, is a question of fact for you. Whether a fight occurred when he was put out the train first, whether he struck the conductor then with his bridles, and exactly what violence was used there,

are questions of fact for you. I have nothing to do in determining these facts. You are to take this whole transaction, and you are to determine whether Mr. Moore was, on that occasion, a trespasser; you are to determine the extent of his trespass; you are to determine the whole nature of his conduct; you are to decide whether he brought this injury upon himself by his own unlawful conduct, or whether the injury was wantonly, cruelly, maliciously, or unnecessarily inflicted upon him—all these matters are for you.

"If you come to the conclusion that Mr. Moore has, under the explanation of the law as I have given it, a cause of action, then your verdict will be for the plaintiff, and it is for you to fix the amount. He has the right, if he has a cause of action, to recover compensatory damages, that which would fully compensate him for the actual injury; and, in addition to that, he would have the right to recover punitive or vindictive damages, if this was done cruelly, wantonly, maliciously, and contrary to the duty of the conductor on that occasion. You cannot exceed the amount of damages—that is, ten thousand dollars; you can find any amount up to and including ten thousand dollars, according to the view you take, if you find for the plaintiff. If, after having heard all of the case, the testimony, the argument, and the law as I have expounded it to you, you are satisfied from the preponderance of the testimony that the conductor did nothing but his duty, and that, although he inflicted serious punishment upon Mr. Moore, yet that Mr. Moore rendered it reasonably necessary and proper under the circumstances, then your verdict will be for the defendant."

The jury found a verdict for the defendant. After judgment was duly entered thereon, the plaintiff appealed to this court upon the following grounds, averring error in the charge of the Circuit Judge:

1. That the defendant had a right to eject from its cars the plaintiff at any place when the refusal upon the demand of the conductor to pay the fare and extra twenty-five cents took place, provided expulsion at such place would not subject the plaintiff to bodily harm and peril; and, upon such refusal, to

use such force as was proper and necessary to put the plaintiff off the train; and particularly in so charging without explaining what was meant by "proper and necessary force" to be used in ejecting the alleged offender, or without proof of the manner of place it was where he was ejected.

2. That if the jury believe, from the facts of the case and the instructions of the court, that the conductor had a right to demand the extra sum of twenty-five cents from the plaintiff, and upon his refusal to pay it, the conductor had a right to eject him, he then became a trespasser, whose duty it was to go off the train without being forced to do so; and if the jury believe that the plaintiff resisted the conductor in discharge of his duty, and in such resistance he received personal injuries which were the direct and necessary result of the application of force rendered necessary by his own resistance, he cannot recover.

3. That in determining the question whether more force or violence was used than was necessary in ejecting the plaintiff, the jury was to take into consideration the amount of resistance offered by the plaintiff to such ejectment, and that if said jury found that he resisted the attempt of the conductor to put him off the train with all the force and power he was capable of, then the law will not with a nicety weigh the amount of force necessary to be used in overcoming such resistance; and that "in such case the defendant would only be liable in a case of palpable and apparent force beyond that which was clearly necessary to be used in overcoming such resistance offered by plaintiff;" and that the railroad company could only in such case be made responsible for the injuries inflicted, which were wilful, wanton, and malicious, because, by resisting to the utmost of his power and ability, the plaintiff invited force, and he ought not to complain of the force used, if there was no intention upon the part of the conductor or his assistants to commit unnecessary injury.

4. That if the jury believe that, after the trainmen had put him off the train, plaintiff attempted to get upon the train for the purpose of assaulting the conductor, and did, in fact, strike him, that he committed a breach of the peace; and that if, in

returning such blow, the conductor seriously injured the plaintiff, the defendant is not liable for the act of the conductor, if the jury further believe that such act was done to carry out any of the purposes, rules, regulations, or directions of the defendant, and that it was not in the scope of his employment. And there was further error on the part of his honor, in sustaining the foregoing "request," in that he had declared that its *main features were correct*, as a proposition of law, which he would probably modify in his general charge, which modification appears nowhere therein.

5. That if the jury believe that, after the plaintiff had been ejected from the train, he voluntarily entered into a conflict with the conductor and brakeman, and brought upon himself the injuries of which he complains, he cannot recover from the defendant, and if they further believe that he was the original aggressor, and brought upon himself the injuries of which he complains.

6. That the conductor has the same right as any other citizen to defend himself against the assaults made upon his person, and that if in such defence he uses more force than is necessary, the railroad company is not liable therefor, unless such act was done wilfully, wantonly, and maliciously, and while performing his duties as conductor within the scope of his employment.

7. That the railroad regulations introduced in evidence are the instructions, the rules, laid down by the company for the guidance and government and control of its employees, which, in so far as they have a bearing upon the case, do not constitute the law of the case, and yet in the same connection declaring "that this case is to be tested by the law of the land; that is what we are governed by. If the rule is consistent with the law, it is nothing but the law; and if it is inconsistent, the law prevails, and the rule goes down," without telling the jury, as was his province and duty, whether or not the rules of the company were inconsistent with and contradictory of the law.

8. "That he who is the aggressor, he who brings the violence upon himself, who forced it, had no right to resort to a court of justice, and to ask at the hands of a jury of his countrymen damages, or compensation for the damages he has brought upon

himself." And that "if the conductor returns the assault and battery, and, perhaps, goes a little further than persons coolly studying about the matter would think that he should go, why, he who brings the trouble upon himself has no right to come in a court of justice and ask damages for injuries of which he himself is the author."

9. That, after discussing the case from the standpoint of the plaintiff's evidence, it was a direct charge upon the facts for his honor to summarize that evidence in these words: "Now, I have spoken of the *unlawful conduct* of the plaintiff in these three instances."

10. That when Mr. Moore refused to pay the extra fare, announcing his purpose not to leave the train until ejected, he then subjected himself to the right, as well as the duty, on the part of the conductor to eject him just where he was ejected, without carrying him any further on his journey. And this without proof as to the condition of the road or country where he was ejected.

11. That our law has invested a conductor of a train with the rights and duties of a trial justice.

12. It is respectfully called to the attention of the court, as a ground for reversal of the judgment below, that his honor further erred in incorrectly stating to the jury the testimony of the plaintiff: (1) In declaring that plaintiff said his shoulder was dislocated or injured when he was thrown down this railroad embankment. (2) In declaring that plaintiff said he was carried by the conductor and his assistants from his seat to the door of the coach in which he was seated, when, as a matter of fact, he said he was thrown by them some distance, striking his head and shoulder against the corner of the ladies' saloon in his flight through the air. And when counsel for plaintiff wished to interpose, and did interpose, to set his honor right, it was further error in the latter to exclaim, "I cannot hear any argument, but if you have any request"—thus excluding opportunity for explanation and correction of the harm done to plaintiff's case by said misstatements.

13. That his honor argued the facts of the case to the jury throughout his charge, and presented them in a light favorable

to the defendant company, in violation of the letter and spirit of the inhibition contained in the Constitution of the State.

In considering the questions underlying this appeal, we will allow such observations, as seem called for in deciding the issues here raised, to take the following order: I. What is the law in this commonwealth in relation to passengers who travel upon railroads, as to the payment of fare, and what are the consequences following a disobedience of that law? II. Were the declarations of the Circuit Judge of the law, as restricted to the matters suggested in the first division of this decision, observed by him? III. Was the charge of the Circuit Judge illegal, in that he charged upon the matters of fact?

I. It will be observed that we have taken the pains to reproduce the charge of the trial judge almost in its entirety. We have done so as an act of justice to both the trial judge and the appellant. The pertinency of this review of so much of our law as relates to passengers in travelling upon railroads in the appeal now being considered, will be apparent to every mind, because here, from the view we take of this case, if such law is against the plaintiff, his cause of action is gone, except from one view that may be taken. And in passing, we will say that we cannot regret the time and labor bestowed upon the consideration of this appeal, because it not only affects the rights of the plaintiff, but also the general public.

That railroads are *quasi* public corporations, is admitted on all hands. They owe a duty to the public, and, to a certain extent, their control is under agencies devised by the public. A very good illustration of this fact may be found in our statutes in regulation of such corporations, yet the property of such corporations is private property. But the public owes them duties, and some of these duties are prescribed by our statute law. Railroads owe the duty to the public to furnish proper transportation—safe, expeditious, and comfortable transportation—over their lines to all classes of our people. This is not a kindness, on the part of these corporations, to the public, but it is a right of the public, on the one hand, and a duty of the railroads, on the other hand. While this is true, in order to enable these corporations to realize the means

with which to answer this duty of the public, and, at the same time, to earn some return for the capital invested in such enterprises, tariffs of rates, both for the transportation of persons and of property, are allowed to be fixed by such railroads. In our State, this right is restricted within certain limits.

This corporation, the Columbia and Greenville Railroad Company, is allowed to charge three cents a mile for every mile a passenger, who is over a certain age, and who occupies a seat in the first class coach, may be transported over this road. This fare is usually paid in the purchase of a ticket at the office of the company at the station where the passenger enters the railway train, and for this purpose such offices are required to be kept open for an half hour before the train leaves; unless this ticket office is so open, a passenger need not purchase a ticket to ride over said railroad at the rate of three cents a mile. But it is not imperative that the passenger shall provide himself with a ticket before entering the train of the railroad company. Yet, if he neglects to purchase a ticket, and the ticket office is open a half hour preceding the arrival of the train, by the laws of this State the railroads are allowed to charge twenty-five cents additional to the fare of three cents per mile. So that we declare the law to be, in such cases, that a passenger who is offered the opportunity, by the railroad on which he proposes to travel, to purchase a ticket, and then neglects or refuses to do so, the railroad fare of such passenger is the ordinary fare and twenty-five cents additional. This amount is what the conductor is authorized to demand and collect.

Now what are the effects under the law, in case the passenger refuses to pay? There are two classes of cases. One where the passenger is ignorant, in fact, of the law in such instance. Another is where the passenger is not ignorant of the law in such instance. Our statute, section 1517 of the General Statutes, fits both cases. Its terms are: "Whoever does not upon demand first pay such toll or fare, shall not be entitled to be transported for any distance." The passenger who is ignorant of such provisions, does not pay such toll or fare, is only denied the right to transportation for any distance. But

in the case of the passenger who knows of such rules, and refuses to pay, if he is guilty of any fraudulent intention to defeat the railroad's right to such toll or fare, is not only not entitled to be transported any distance, but, under the provisions of this very section, is made liable to forfeit a sum not less than five dollars nor more than twenty dollars. The conductor of a railroad in charge of a passenger train, or other train whereon passengers are admitted to be transported, is the collector of the toll or fare to be paid by passengers, and by law the duty is confided to him, amongst his other duties, to enforce the payment of such toll or fare by passengers. When a passenger neglects or refuses to pay to such conductor his toll or fare, it is made the duty of such conductor to act. In the performance of such duty, upon such refusal of the passenger to pay, on demand therefor, such toll or fare, he may request such passenger to leave the train, provided such train is brought to a stop, and it is the duty of the passenger thereupon to leave the train; and in case such passenger refuses to leave the train on such request, the conductor may lawfully use the force requisite to remove such passenger, the use of such force by the conductor to be apportioned to the resistance of the passenger.

We apprehend, from the line of argument here adopted, that these propositions of law would have been admitted, if a rule of the defendant company, providing that in case a passenger failed to pay the toll or fare demanded of him, it should be the duty of the conductor to eject such passenger at the next station; this rule, it being contended, having entered into the contractual relation between defendant and plaintiff. Strictly speaking, no contract can be said to exist between these parties litigant as to transportation. Certainly none existed on the subject of transportation when the plaintiff refused his assent to the proposition of the railroad, as made by its agent to plaintiff. There is no right in the public as to transportation of passengers under our law, unless the toll or fare is paid. It is this payment that evidences the assent of the mind of each party to such contract; such a meeting of the minds of the contracting parties is essential as a first element in any contract. We have already shown that the contract

proposed by the railroad company was legal; that it was legal for them to propose to transport the passenger at the rate of three cents a mile for the distance to be traveled by him, with the addition of twenty-five cents for his failure to provide himself with a ticket at the office where the passenger entered the railway train.   It is difficult to see how any contractual relation was established between these parties, and hence the difficulty of saying that the rule No. 146 of the defendant company entered into as a part thereof the "contractual relation" of these parties.

Admit, for the sake of the argument, that the plaintiff, being one of the people, had the right to become a passenger on defendant's train, and that he entered such train to become a passenger, and that for the time he was entitled to the character attaching to passengers, yet when the toll or fare, legally established, was demanded of him by the conductor, and he refused to pay, what contractual relation was thereby established between the parties on the subject of transportation? We admit that all the laws pertaining to the contract enter into a contract when once made, just as if such law were embodied as provisions of the contract.   But it by no means follows that such provisions of the law touching such contract enter into the attitude of parties capable of contracting, but who do not actually enter into a contract.   No matter, therefore, that the plaintiff had the right to enter the passenger coach of defendant, yet his refusal to comply with the law forfeited his right to be regarded after such refusal as a passenger; from that moment he became a trespasser upon the private property of the defendant.   But to return to the rule of the company.   The company had the right to make it; it did not contravene any law of this State.   Its adoption was not necessary under the law, and its repeal or modification were equally legal by the railroad.   Its existence was a question of fact, and we will see later on by the testimony that such rule was suspended.   The law of this State does not make such rule the basis of any right to a person who was defying the rights of the railroad to collect its legal toll or fare from passengers.

II. Was the charge of the Circuit Judge in this case consist-

ent with the law of this State? We have read the charge, and must say that it is carefully prepared and is in conformity with such laws. Of course, the trial judge erred when he said the conductor was a trial justice under our law. He meant a constable. The connection in which such words occur in the charge, produced no harm to the plaintiff. It is but just to the appellant here that we should not confine ourselves to this general commendation of the language of the charge on the law points suggested in the argument.

(*a*) It was not error in the Circuit Judge to hold, that a person who enters a passenger coach as a passenger, and who, upon demand for his fare by the conductor, refused to pay the legal fare of such passage, thereby became a trespasser upon such train. Did not the plaintiff violate the rights of the defendant, when he refused to pay to its legally appointed agent, the toll or fare due for passage in its coach for passengers? As it is the law, that he who "has by law the right to enter upon the lands of another for a certain purpose, and after entry does something which he is not entitled to do, then he is considered a trespasser *ab initio,* or as if his entry had been unlawful" (2 R. & L. Law Dict., 1292); so it is the law, that he who has, by law, the right to enter a passenger coach for the purpose of transportation, and after entry refuses to comply with the requirements of the law to entitle him to transportation thereon, then such person so entering is considered a trespasser *ab initio,* or as if his entry had been unlawful.

(*b*) The Circuit Judge did not err in declaring the law applicable to ejecting trespassers from the train by the conductor. To eject a trespasser is lawful. For the purpose of such ejection, if force is necessary, it may be used; the use of such force is to be proportioned to the resistance to removal by the trespasser. (*c*) Nor did the judge err in holding, that if a conductor is assaulted, he may also assault his assailant; that a conductor by reason of such office is not divested of the right of self-defence; that if in danger from his assailant of death or great bodily harm, he may meet force

with force: (*d*) Nor did he err when he held, that if a conductor while in discharge of his duty to the railroad company, is assaulted so that personal injury is being done him, he may strike until the danger is averted, and that when injuries to the assailant are the result of such self-defence by the conductor, the jury are not required to nicely weigh such injuries of assailant, to see whether the punishment he received was too severe. (*e*) Nor did the Circuit Judge err when he held, that when one assaults a conductor while in the performance of the duties of his office, and when in repulsing such force by the conductor the assailant is injured severely, the conductor, when his conduct is being considered by a jury, is not subject to punishment for such injuries, unless greatly disproportioned to the violence offered him, and unless the said injuries were inflicted wantonly, maliciously, &c.

(*f*) Nor did the Circuit Judge err when he held, that in ejecting a person who refused to pay for transportation, the conductor might remove him at any point on the road, provided the place selected was not such as would work an injury to the party ejected—for instance, not in a pond of water, on a high trestle, or in a dangerous swamp.

(*g*) Nor did the Circuit Judge err, in laying down the law as applicable to the case at bar, by holding that an employee of a railroad company could only visit the results of his acts upon the railroad company, when such acts from which injury to the person or property of another resulted, were committed while in the discharge of the service owed the railroad company by such employee in the line of his employment. *Cobb* v. *Columbia, &c., Railroad Co.*, 37 S. C., 194.

(*h*) Nor did the Circuit Judge err in his charge, when he declined to consider rule 146 positively obligatory upon the defendant to have carried the plaintiff on its passenger train to Wallaceville, that being the next station in the way of defendant's train on its way to the city of Columbia; for, besides other reasons, the testimony of the witness, O. E. Hughes, was that it was not only the railroad law in 1889, but the State law, that conductors should put off passengers,

when they refuse to pay the fare, without any delay, and that such were the instructions from his superior officer. This testimony was not contradicted afterwards. It was not objected to at the time it was offered. No questions were addressed witness as to whether such directions were embodied in written or printed form. It having been held that the railroads could change their rules at will, if not contrary to law, and there being no relation subsisting at the time of this occurrence between the plaintiff and defendant that necessitated his being informed of any change in the rules of the railroad, we are at a loss to understand upon what theory the plaintiff bases his right of action growing out of this matter.

If we were required to express an opinion in this case, we would say that the complaint of the plaintiff should address itself to the strength of the evidence of the defendant, which directly antagonized every material allegation of injury he received, that was not directly traceable to his persistent refusal to admit that there were any rights in others that he was bound to respect. This seems to have been the insuperable obstacle in his way before the jury. While he complains of his bodily injuries, he should not forget that his violent physical assertion of his right to be carried on his own terms on defendant's railway, has caused a lifetime injury to a worthy official of this same defendant—we mean Mr. Winn.

III. We recognize fully the force of the decisions of this court, that a Circuit Judge is inhibited, by the Constitution of this State, from indicating his opinion upon the facts to the jury. It is a provision of our organic law: "Judges shall not charge juries in respect to matters of fact, but may state the testimony and declare the law." Numerous decisions of this court have enforced this wise provision of our law, and we will not, cannot, hesitate to grant a new trial if the Circuit Judge has trenched upon this provision of our law. There are three suggestions of error that are to be considered here: (*a*) That the Circuit Judge charged upon the facts. (*b*) That the Circuit Judge charged upon the facts by stating incorrectly the testimony of plaintiff. (*c*) That the Circuit Judge charged upon the facts in misstating certain testimony, and then prevented counsel for plaintiff in

calling the attention of such Circuit Judge to such error, with a view of its correction.

(*a*) What is meant by the judge charging upon the facts? It seems to us it may be said to occur when, in the progress of a trial, the Circuit Judge conveys by word his opinion upon the sufficiency or insufficiency of certain testimony in determining, by the jury, some fact at issue between the parties litigant. It must be by charge—that is, oral or written statements of the judge to the jury. It must be an opinion on some matter of fact. It must be such an expression of opinion on a matter of fact, that thereby the jury are made to know what is his estimate of the truth or falsity of some matter in testimony, and, lastly, such expression by the judge must relate to some matter of fact at issue between the parties. This court, in construing this section of the Constitution, has held that any expression of the Circuit Judge in his charge that did not relate to the issues being tried by the jury, that were not pertinent to such issues, did not fall within the interdicted action on the part of the judge. *State* v. *Sims*, 16 S. C., 495; *State* v. *Corbin et al.*, *Ibid.*, 545.

Now plaintiff has contended that the Circuit Judge did his case great harm, by stating to the jury that he had "spoken of the unlawful conduct of the plaintiff in these three instances." The judge says that the three instances were: (1) his refusal to leave the train when requested so to do; (2) his effort to get on board the train after being ejected; (3) his last effort to board the train at the platform at the rear of the passenger coach. Now these acts of the plaintiff were admitted by him in his testimony. Every other witness testified to them. Where was there any issue between these parties as to those matters of fact? There was none. This being so, where did the Circuit Judge err in referring to them as unlawful? The facts being admitted, the judge had the right to state the legal effect of such admitted facts; they were unlawful, and hence no error was committed by the judge in this particular.

But great emphasis is laid to the manner employed by the judge in stating the testimony. This court has decided that, while he cannot charge upon the facts, yet he may state

the·testimony in its logical order, and as bearing upon certain issues. In *Benedict* v. *Rose,* 16 S. C., 630, it was said : "Accordingly, the Constitution declares that he has the right to state the testimony and declare the law. What is the proper extent and scope of this power? It has been properly held, that stating the testimony means more than repeating it. It includes the idea of stating it in its logical relations to the propositions which it is to support or contradict as well as to the principles of law by which its bearing and force ought to be controlled, or, as it is expressed by the technical phrase, 'summing up.' " It should be remembered, that·in this case it was required, that for the first time the question of the railroad to eject a passenger who had not paid the fare between stations, should be passed upon. The case of *Hall* v. *Railway Co.,* 28 S. C., 261, had been decided, wherein the Chief Justice, anticipating, as it were, the question in one of its forms, announced : "We are not prepared to lay it down as a rule of law, that where a passenger on a railroad train refuses to pay his fare, the conductor cannot eject him between stations, but is bound to take him on to the next regular station before he can be ejected. It seems to us that this would largely depend upon the circumstances of each particular case." In the case last cited, it was the passenger who was complaining of being carried beyond the point where he requested to be left. The railroad conductor was at fault, and it ultimated in the railroad having to pay damages. Still, in this last mentioned case, this question was not squarely presented. Now under these circumstances the Circuit Judge, in the case at bar, very gravely viewed the matter to be decided, and lent every energy of his mind to making clear to the jury those propositions of law upon which the proper solution of the questions involved would depend. To do this thoroughly he had to present the testimony by way of summing up the same. He was very careful to admonish the jury, from time to time, during his charge, that all questions of fact had to be solved by them, and that he could not legally do so. Under these circumstances, we are constrained to find that the Circuit Judge has not erred. If it will prove of any satisfaction to the appellant to

know it, his vigorous presentation of this question made quite an impression on at least one member of this court; but after a careful study of the charge and the testimony relating to its propositions, all difficulty in this matter was removed.

(*b*) That the Circuit Judge charged upon the facts, by stating incorrectly the testimony of the plaintiff. After a full consideration of this matter, we must state that the judge's inaccuracy of recollection, in not correctly placing before the jury the exact language of the plaintiff as to when he was injured, will not justify us in granting a new trial. It made no difference when his shoulder was dislocated, if at all; that injury was what the jury should have in their minds, and it made no difference whether the shoulder was dislocated by being struck against the corner of ladies' saloon, or when the plaintiff was thrown down the embankment. Therefore, the error is not sufficient to base a request for a new trial upon.

(*c*) That the judge charged upon the facts, &c. Now it is contended, and the "Case" does disclose, that one of plaintiff's counsel, as the judge finished his charge, arose and was in the act of addressing the court, when he was stopped by the judge, with the remark: "I can't hear any argument, but if you have any request." At these words counsel said: "I have nothing more to say, sir." It seems to us counsel stopped too quickly. He ought to have demanded his right to be heard—of course, in courteous terms—and then if the judge refused to hear him, we would have most thoroughly considered his complaint. We take a decided stand on counsel's right to be heard in any court—of course, subject to the rules of law. But we can have no sympathy for a toleration of a practical denial of the rights of litigants, when the request of his counsel to be heard is made to the court. And, in justice to the bench, we are satisfied no such attitude is ever assumed knowingly to the bar. Still, we would be understood in all frankness. If counsel had persisted, and then the court declined to make the proposed correction, we should have unhesitatingly upheld the rights and privileges of the bar. We must overrule this objection also.

3—38

It is the judgment of this court, that the judgment of the Circuit Court be affirmed.