### FULMER v. SOUTHERN RAILWAY CO.

PASSENGERS—FARE.—THE RAILROAD companies of this State have no right to demand and collect of passengers boarding trains without tickets an *excess fare* of twenty-five cents over *maximum* rate fixed by statute, where such passengers have an opportunity to purchase tickets at regular ticket offices before boarding trains.

MESSRS. JUSTICES JONES and WOODS and CIRCUIT JUDGES TOWNSEND and GAGE, *dissent.*

Before JAS. F. IZLAR, special Judge, Newberry, October, 1902. Reversed.

Action by Samuel C. Fulmer, by guardian *ad litem,* against Southern Railway Co. From judgment for defendant, plaintiff appeals. Argued before Court *en banc,* January 27, 1903.

*Messrs. Johnstone & Welch,* for appellant.

*Mr. T. P. Cothran,* contra.

No arguments furnished.

July 29, 1903. The opinion of the Court was delivered by

MR. JUSTICE GARY. The only question presented by this appeal is whether his Honor, the presiding Judge, erred in charging the jury, as set forth in the appellant's sole exception, which is as follows: "Because he erred in charging the jury that the defendant had the right to demand and collect of the plaintiff an excess fare of twenty-five cents, if the plaintiff tendered his fare in money on board of the train after an opportunity had been given him to purchase a ticket at the regular ticket office of the defendant; and that it had the right, if the plaintiff refused to pay this excess fare, to eject him from its train, although the plaintiff had tendered the fare at three cents per mile for every mile he proposed to travel." Before proceeding to discuss this question, it may be well to review the legislation upon the subject of railroad fares for the transportation of passengers. Prior to the act of 21st December, 1882 (18 Stat., 10), there had been no general legislation, in this State, on this subject. Under the common law rule governing common carriers of passengers, the railroads were required to charge reasonable rates for transportation, but were not otherwise limited in fixing the rates for transportation. *Ex parte Benson*, 18 S. C., 38. The act of 1882 placed the whole subject of freight and passenger rates under the control of the railroad commissioner, who was required to "make reasonable and just rates of charges for freight and passenger carriage, to be observed by all railroad companies doing business in this State on the railroads thereof." This act was amended by the act of 24th December, 1883 (18 Stat., 480), as follows: "Section 7. That the following section be inserted in the General Statutes of this State, to be known as section 1451 f: From and after the passage of this act, no railroad company in this State operating, owning or controlling any line of railroad whose passenger earnings exceed $1,200 per mile

of road per annum, shall charge more than three cents per mile for each passenger, with 100 pounds of baggage. On roads whose passenger earnings are over $700 and not more than $1,200 per mile per annum, the rate shall not exceed three and one-half cents per mile, except the Charleston and Savannah Railway Company, which shall have the right to charge four cents per mile for first and three cents per mile for second class passengers. On roads whose passenger earnings do not exceed $700 per mile per annum, such rate shall not exceed four cents per mile. The charge for children for under twelve and over six years of age shall not exceed two cents per mile. Each railroad shall also run a second class or smoking car for passengers, in which they shall sell tickets at a rate not to exceed two and one-half cents per mile on the first class and three cents per mile on the second and third class of railroads as above prescribed: *Provided,* That railroad corporations may charge for short distances where the charge by the mile would be less than twenty-five cents, the sum of twenty-five cents for the first class passage and fifteen cents for the second class passage, and children for such distances. The provisions of this section shall not prevent railroads from issuing thousand mile, excursion, commutation and season tickets at a lower rate than is herein provided."

This act was again amended by the act of 24th December, 1884 (18 Stat., 759), which after making changes with regard to the rates fixed by the act of 1883, provided as follows: "Section 2. That section 1451 f (A. A. 1883, p. 485-6), be amended by adding at the end thereof the following: And railroad companies shall have the right to charge twenty-five cents extra when the fare is not more than two and 50-100 dollars, and fifty cents when it is over that amount in all cases where passengers who get on at stations where tickets are offered for sale, neglect or refuse to purchase tickets: *Provided,* This shall not apply to passengers on accommodation trains: *Provided further,* That offices for the sale of such tickets shall in all cases be open not

less than thirty minutes before the time fixed for the departure of trains."

On 19th of December, 1892 (21 Stat., 8), an act was passed providing for the election of three railroad commissioners. Section 5 of that act provides, "that the commissioners elected as hereinbefore provided shall, as provided in the next section of this act, make reasonable and just rates of freight and passenger tariffs to be observed by all railroad companies doing business in this State on the railroads therein." Section 6 of the said act contains the provision, "that the said railroad commissioners are hereby authorized and required to make for each of the railroad corporations doing business in this State, as soon as practicable, a schedule of just and reasonable rates of charges for transportation of passengers and freights and cars, on each of said railroads."

In 1896, an act was passed (22 Stat., 116), the first section of which was as follows: "Section 1. That from and after the passage of this act, the rates of transportation of passengers by railroad companies chartered and doing business in this State shall be for first class fare, three and one-fourth cents per mile for every mile traveled, and for second class fare, two and three-fourths cents per mile for every mile traveled, and shall sell first and second class tickets: *Provided,* This rate may from time to time be altered and changed by the railroad commission as to any railroad or railroads as in the judgment of said railroad commission the circumstances of such railroad or railroads may warrant or require." This act contains the usual repealing clause, and was approved on the 9th of March.

The last enactment on the subject is the act of 1900 (22 Stat., 457), the third section of which is as follows: "Section 3. That sixty days after the approval of this act the *rate* for transportation of passengers on all railroads to which the provisons of this act shall apply shall not exceed three cents per mile for every mile traveled, and such railroads shall not be required to have second class coaches or to

sell second class tickets." This act also contains the usual repealing clause.

The defendant introduced in evidence the following circulars:

"(Circular No. 32.) Office of Railroad Commissioners, Columbia, S. C., August 13th, 1894. On and after August 17th, 1894, the railroads of this State are hereby authorized to charge passengers twenty-five cents extra where fare is not more than two 50-100 dollars, and fifty cents where it is over that amount, in all cases where the passengers get on at stations where tickets are offered for sale, neglect or refuse to purchase tickets: *Provided,* That offices for sale of such tickets shall in all cases be open not less than thirty minutes before the time fixed for the departure of trains. By order of the Board. D. P. Duncan, Chairman. M. T. Bartlett, Secretary."

"(Circular No. 37.) Office of Railroad Commissioners, Columbia, S. C., May 4th, 1895. On or after June 10th, 1895, Circular No. 32, issued by the board 17th August, 1894, shall have added thereto the following: *Provided,* That the conductor shall give the passenger a return check for the amount of excess charged, to be redeemed upon presentation at any ticket station of the company. W. D. Evans, Chairman. D. P. Duncan, Secretary."

"(Circular No. 42.) South Carolina, office of Railroad Commissioners, Columbia, S. C., April 2, 1896. To enable the railroad companies operating in this State to prepare and promulgate their passenger rate sheets in accordance with the act of the General Assembly, approved March 9th, 1896, and the action of this commission pursuant thereof, the passenger rates now in force will be continued until the first day of May next. On and after that date the following rates will be enforced by the commission on the railroads doing business in South Carolina, to wit: Three and a quarter cents (3 1-4 cents) per mile for first class fare; two and three-quarter cents (2 3-4 cents) per mile for second class fare, on the following roads: * * * On all railroads a half fare of not

more than two cents per mile for children under twelve years old or over six years of age shall be charged. No railroad company shall be allowed to charge more than ten cents as a minimum, full or half rate between regular stations, when the fare would be less than that amount. The fare should always be made that multiple of five or nearest reached by multiplying the rate by the distance. In addition to these rates, passengers unprovided with tickets, when opportunity has been afforded them by the railroads to procure the same, may be required by the railroads to pay to the conductor twenty-five cents (25 cents) excess of the fare, upon receiving from the conductor a draw back ticket for the twenty-five cents, which shall be cashed on presentation at any ticket office of the company within twenty days after date. This circular supercedes all other circulars in conflict. W. D. Evans, Chairman. D. P. Duncan, Secretary."

The following circular was also introduced in evidence:

"Southern Railway Company, Passenger Department, Circular No. 1900-3, Superceding Circular No. 797, File No 42, 226, Washington, D. C., January 27, 1900—Rebate Ticket in South Carolina. To all conductors and ticket agents in South Carolina: Conductors have been supplied with rebate tickets, Form C. R. C., a *fac simile* of which is printed below, for use under the following instructions: A rate 25 cents higher than agent's rate should be charged for each fare collected in cash between any two stations within the State of South Carolina, under the rules governing the collection of conductor's rates.

"A rebate ticket, Form C. R. C., should be issued to the passenger for each excess cash fare collected between any two stations within the State of South Carolina. These tickets should be written up to show: (a) Name of conductor. (b) Points between which fares are collected. (c) Train number, and punched to show date of issue, whole or half fare and amount collected, as designated. The duplicate ticket should be examined carefully to see that it agrees

with the original and forwarded to the ticket auditor with report of cash fare collections. Special attention is called to the fact that these rebate tickets are to be issued exclusively for rebate fares collected within the State of South Carolina, and are not to be issued for fares collected between interstate points, nor are they to be issued for fares collected at agent's rates within the State of South Carolina, which do not require a rebate.

"Conductors will continue to use the Blanchard form of cash fare receipt for fares collected at agent's rates and between interstate points.

"The excess rate of twenty-five cents will be refunded to passengers upon the surrender of the original rebate ticket to any ticket agent within the State of South Carolina within twenty (20) days after date of issue cancelled on the margin.

"Ticket agents should stamp all rebate tickets redeemed and forward the same to ticket auditor with report, Form 1950, at the end of each month. The total amount of this report should be entered on credit side of Summary Passenger Traffic, Form 1684, opposite heading, 'Excess Cash Fares Refunded.' "

As the act of 1900 provides that the rate for transportation of passengers shall not exceed three cents per mile for every mile traveled, it will at once be seen that the important question to be determined is whether the requirement that the passenger should pay an excess fare of twenty-five cents when he neglects to purchase a ticket, is inconsistent with the statute by reason of the fact that such requirement would be regarded as an extra *charge*. It cannot now be successfully contended that the defendant had the right, under the act of 1884 hereinbefore mentioned, to charge the excess fare; for the case of *Kibler* v. *Ry. Co.*, 62 S. C., 252, 40 S. E., 556, decides that it was repealed by the act of 1900. The general rule as to the payment of fare on the train, is thus stated in 25 A. & E. Enc., 1104: "A railroad company may establish a rate of fare for passengers failing to provide themselves with tickets before entering the train, higher than

the ticket rate, the extra charge being regarded as a compensation to the company for the additional inconvenience to which it is subjected by being compelled to receive the fare by the hands of the conductor. * * * But the car rate can, in no case, exceed the maximum allowed the company by its charter, or a statute fixing rates."

What was the object of the legislature in repealing the act of 1884? It was unquestionably for the purpose of depriving the railroad company of the power to enforce the collection of excess fares, whether the money went permanently or temporarily into the treasury of the company. One of the definitions of the word "charge," in A. & E. Enc., 889, is as follows: " 'Charge' is the price required or demanded for services rendered, or less frequently for goods supplied." This definition is approved in *Reese* v. *Penn. R. R. Co.,* 6 L. R. A. (Pa.), 529, which is the main case upon which defendant relies to sustain the proposition that the excess fare is not a *charge.* In that case the Court says: " 'Charge' is a word of very general and varied use. Webster gives it thirteen different meanings, none of which, however, expresses the exact sense in which it is used in this charter. The great dictionary of the Philological Society gives it twenty-seven principal definitions, besides a nearly equal number of subordinate variations of meaning. Of these definitions one (106) is, 'The price required or demanded for services rendered, or (less usually) for goods supplied,' and this expresses accurately the sense of the word in the present case. The essence of the meaning is that it is something required, exacted or taken from the traveler as compensation for the services rendered, and, of course, something taken permanently, not taken temporarily and returned." The reasoning of the Court in the case last mentioned is fallacious in making the price, or something required, exacted or taken from the traveler, to depend upon the fact that it is taken *permanently,* not temporarily and returned. In order to show that this is not the correct test, it is only necessary to say that if the rebate check had pro-

vided that the excess fare should be refunded after a certain
number of days, months or years, it would at once appear
that the railroad company had received more than three cents
per mile for every mile traveled, as the use of the money is a
valuable consideration.    If the railroad company had
adopted a rule that a passenger should not be permitted to
board its train or check his baggage until he exhibited a
ticket, it might well be contended that this was a mere *regu-
lation;* but not so, when the passenger is required to pay
more *money* for his transportation than is permitted by the
statute, even though under certain circumstances he may
have the excess charges refunded to him.    In the case of
*Williamson* v. *Association,* 54 S. C., 582, the Court says:
"It is a well settled principle that when the construction to
be given a contract is rendered doubtful by the language
thereof, the interpretation of the contract by the parties
themselves, is entitled to great weight."    Let us, therefore,
see in what light the defendant has construed the charges for
excess fare, in its instructions to its conductors and ticket
agents in South Carolina, hereinbefore mentioned.    The cir-
cular shows that the defendant has two rates for transporta-
tion of passengers—a conductor's rate and an agent's rate.
It also refers to the conductor's rate as a *charge.*    It also
speaks of the twenty-five cents *excess cash fare,* thus show-
ing that the defendant did not regard the excess charge as a
mere regulation.    Another significant fact disclosed by the
circular is the following direction to conductors: "Special
attention is called to the fact that these rebate tickets are
to be issued exclusively for excess fares collected within the
State of South Carolina, and are not to be issued for fares
collected between interstate points, nor are they to be used
for fares collected at agent's rate within the State of South
Carolina which do not require a rebate."    This shows that
the defendant had in view the financial benefit to be derived
from charging excess fares.

It is the judgment of this Court, that the judgment of the

Circuit Court be reversed, and the case remanded to that Court for a new trial.

MR. CHIEF JUSTICE POPE and CIRCUIT JUDGES JAMES ALDRICH, ERNEST GARY, J. C. KLUGH, CHAS. G. DANTZLER and R. O. PURDY, *concur.*

MESSRS. JUSTICES JONES and WOODS and CIRCUIT JUDGES D. A. TOWNSEND and GEO. W. GAGE, *dissent, and concur in dissenting opinion of* MR. JUSTICE JONES.

CIRCUIT JUDGE ERNEST GARY, *concurring.* I concur in the opinion of Mr. Justice Gary for the following reasons: The relations between the carrier and passenger is contractural. The carrier being a party to the contract, is clothed with great authority in saying when and upon what terms he will enter into the relation of carrier of passengers. For instance, the carrier has the authority to say to the public before this relation shall exist between us, you must provide yourself with a ticket, and until this requirement has been complied with by the would-be passenger, the carrier would have the right to refuse him admittance upon its cars. The exercise of such power would simply be the enforcement of a reasonable rule and regulation. In the case at bar, however, we find no such rule or regulation. We find the carrier permitting the public to board its trains as passengers either with or without a ticket. In this case clearly the relation of carrier and passenger existed at the time the plaintiff tendered to the conductor of defendant's train the full fare provided by statute. And when the conductor of such train exacted from the passenger any sum in excess of the maximum fare provided by statute, he exceeded his authority; for the reason that he was exacting of the passenger more than the statute authorized. What, then, was the passenger's right? It was to pay or tender to the agent of the defendant the maximum charge fixed by the statute and be transported to his destination.

MR. JUSTICE JONES, *dissenting.*    In this action for damages for ejection from defendant's passenger train there was verdict and judgment for defendant, which plaintiff seeks to reverse upon the following exception to the charge of the presiding Judge: "Because he erred in charging the jury that the defendant had the right to demand and collect of the plaintiff an excess fare of twenty-five cents, if the plaintiff tendered his fare in money on board of the train after an opportunity had been given him to purchase a ticket at a regular ticket office of the defendant; and that it had the right, if the plaintiff refused to pay this excess fare, to eject him from its train, although the plaintiff had tendered the fare at three cents per mile for every mile he proposed to travel."    It is not disputed that plaintiff had full opportunity to purchase a ticket from the station agent at Prosperity, where he boarded the train for Newberry, but failed to do so; that when the conductor demanded the regular fare from Prosperity to Newberry, twenty-one cents for seven miles and twenty-five cents additional as "excess fare," plaintiff tendered the regular fare but declined to pay the "excess fare;" that upon his refusal to pay the "excess fare" the conductor stopped the train and lead plaintiff off; that the regulations of the defendant company required conductors to collect such "excess fare" in such cases and to give the passenger a "rebate check" containing these words: "The excess rate of 25 cents will be refunded to passenger upon surrender of the original rebate ticket to any ticket agent within the State of South Carolina within twenty (20) days after date of issue cancelled on margin;" and that plaintiff was informed by the conductor that such rebate ticket would be given him.

The charge of the presiding Judge to which the exceptions relate is as follows: "I charge you that railroad companies have a right to adopt reasonable rules as to the method of paying fares by passengers who use their passenger trains for the purpose of being transported from one place to another. and to discriminate between fares paid on board

their trains at stations, and to remove from their cars in a proper manner and at a proper place, persons who refuse to comply with such regulations; and that regulation requiring passengers who do not procure tickets at stations where tickets are sold before boarding their trains and commencing their journey, to pay an extra amount of fare, and providing that if the coupon shall be given to the passenger on which he may collect extra fare from an agent at a station, and exempting from its operation such passengers as board their trains at stations where tickets are not sold, that such would be, in my opinion, a reasonable regulation; and I, therefore, charge you that I hold it would be a reasonable and valid regulation. There is no question that railroad companies may make such regulations as I have charged you, provided passengers are given a convenient place and sufficient opportunity to procure tickets previous to boarding trains to become passengers, and such regulations would not be unreasonable nor oppressive nor open to the objection that the excess so imposed is a part of the fare and makes the fare charged higher than the rate allowed by law, which in this State by statutory provision is three cents per mile." Without raising any objection as to the general form of the exception, in that it does not accurately represent the charge of the presiding Judge, we will consider the question designed to be presented—whether a railroad company in this State may, in a lawful manner, eject from its train a person who boards it to become a passenger but having no ticket, although opportunity had been afforded for purchasing the same, and upon demand of the conductor for the regular fare and twenty-five cents "excess fare" under the "rebate check" regulation of the company, tenders the regular fare of three cents per mile, but fails or refuses to pay the "excess fare." I think this question should be answered in the affirmative, in accordance with the instructions to the jury, upon the ground that a railroad company may enforce in a lawful manner its regulations which are reasonable and not inconsistent with the law of the State. The reasonableness

18—67

of the regulation in question is apparent from a considera-
tion of the matters brought out in the testimony of W. A.
Turk, general passenger agent of the Southern Railway
Company, who testified as follows: "The necessity for this
rule is brought about by the fact that a very large percentage
of fares paid on the trains are paid by passengers traveling
short distances, and as the conductors in charge of passenger
trains have onerous duties to perform in connection with the
safe conduct of their trains in the matter of receiving and
giving close attention to telegraphic orders and carefully
observing schedule so as to make meeting points and passing
trains in safe and proper manner, and for the further pur-
pose of giving due and careful attention to the general
conduct of their trains and the careful transportation of the
passengers thereon, it is of great importance that they should
not be further burdened by having to collect money fares
from passengers who have failed to provide themselves with
tickets. The making of change, the entering of cash fares
in their cash books and the keeping of records necessary for
report of such transactions to the accounting department of
the company, requires more time than a conductor would
have at his disposal if he were compelled to collect cash fares
from all passengers. If conductors' rates were the same
as agents' or regular ticket rates, then there would be no
inducement for a passenger to purchase a ticket from the
agent before entering the train. A passenger would rather
pay his fare to the conductor, that being more convenient,
than to secure a ticket before getting on the train, thus
placing a burden of work upon the conductor which he has
not the time to perform. Another, and probably one of the
most important reasons for the necessity of a railroad com-
pany's requiring passengers to purchase tickets before enter-
ing the trains, is that it enables the company to have a much
better check upon its revenues and a better assurance that
the business is conducted in a safe and businesslike manner.
Q. Please state if the rule and practice of requiring the
collection of excess fares has the effect of encouraging the

purchase of tickets and of saving the railroad company the risk and trouble incident to the collection of cash fares by conductors on trains? A. There is no question in my mind that the rule and practice of requiring passengers who board trains without tickets to pay excess fares, even though such excess fares be refunded, has a decided tendency to induce passengers to purchase tickets; thus eliminating, to a very great extent, the annoying habit of paying fares to conductors on trains, and of generally promoting the better conduct of business on passenger trains. Q. How long have you been connected with the passenger departments of railroad companies? A. I have been in the passenger business in various capacities for about twenty-two years. Q. Is the rule requiring the collection of excess fares from passengers unprovided with tickets generally in effect on railroads throughout the country? A. Yes, sir; I do not now recall a single railroad that does not have such a rule in effect. Q. Is this rule, or a similar one, in effect in all of the States traversed by the lines of the Southern Railway Company? A. We have in effect such a rule in the eight States in which the Southern Railroad Company operates."

There is no conflict among the authorities on the rule that when a reasonable opportunity is afforded for the purchase of a ticket and none is purchased, a railroad company may lawfully collect a small sum in excess of regular fare, provided the maximum rate allowed by law is not exceeded, and that such a regulation is reasonable and may be enforced by ejection for non-compliance. *Moore* v. *R. R. Co.,* 38 S. C., 1, 16 S. E., 781, and numerous cases cited in note 20, L. R. A., 483.

The important question remains whether such a regulation as we have under consideration is in conflict with the act of 1900, 23 Stat., 457, providing, "That sixty days after the approval of this act, the rate for transportation of passengers on all railroads shall not exceed three cents a mile for every mile traveled." This statute contains a clause repealing all inconsistent statutes. The act of December 24, 1884,

18 Stat., 760, must be regarded as repealed, in so far as it allows any rate or charge for transportation in excess of the maximum rate provided by the act of 1900. *Kibler* v. *R. R. Co.*, 62 S. C., 271, 40 S. E., 556. But the point here is, not whether the regulation of the company as to "excess fare" is sustainable under the act of 1884, which allowed the right to *charge* twenty-five cents extra when the fare did not exceed two and 50-100 dollars, but whether such regulation as was attempted to be enforced in this case is in conflict with the act of 1900, because it increases *"the rate for transportation of passengers."* I do not think there is any conflict between the regulation and the statute. The rate for transportation is the standard price or charge for the service of transportation, and involves the absolute right to retain it when received. The so-called "excess fare" is, in fact, no fare, charge or rate, *in the sense of the statute,* because it is refundable to the passenger on demand at any station within twenty days from date of payment. How is the rate of transportation increased by the excess fare when the passenger has the absolute right to have it returned to him on demand? But it is said the exaction is called an excess charge or fare by the railroad company, and it must be such. To this it is sufficient to say that the law has regard for substance and meaning rather than for mere forms of expression adopted for the sake of brevity and convenience. But it is said the railroad company has no right to compel a passenger to become its creditor for the amount of the extra sum. Such is not the design of the regulation. Its purpose is to induce all passengers to purchase tickets at designated agencies *at the rate authorized by law.* The passenger may easily avoid the inconvenience arising from the regulation by doing his duty in purchasing a ticket at the lawful rate from a regular ticket agent provided for the mutual convenience and benefit of both passenger and carrier. The inconvenience to which the passenger is subjected by the regulation is one which arises from his own want of regard for the reasonable convenience of the carrier in the proper conduct of its

business.  Again, it is argued that the requirement that the passenger must make demand for return of the "excess fare" within twenty days, makes the regulation unlawful.  Whether the passenger may not rightfully require return of the excess at any time within the statute of limitations is not now before us for decision, as the case involves no refusal to pay on demand after the expiration of twenty days, but I am inclined to think return of the money may be enforced after the expiration of the time mentioned.  But be that as it may, the limitation of itself could not make the "excess fare" *a rate or charge* in the sense of the statute; for if the money is not demanded within the specified time, the loss to the passenger is not due to any increase in the *charge* for transportation, but merely because of his own choice or negligence.  The case of *Reese* v. *Pennsylvania R. Co.,* 6 L. R. A., 529, is squarely in point.  In that case it was decided that an extra demand of ten cents from a passenger without a ticket which will be refunded at any regular ticket office on presenting a check given him by the conductor, is not a part of the fare or "charge for transportation," within the meaning of a statute fixing the maximum rate of fare. The statute of Pennsylvania provided: "In the transportation of passengers no charge shall be made to exceed three and one-half cents per mile, &c."  In construing the meaning of the word charge, the Court says: "The essence of the meaning (charge) is that it is something required, exacted or taken from the traveler as compensation for the services rendered, and, of course, something taken permanently, not taken temporarily and returned.  The purpose of the restriction in the charter is the regulation of the *amount of fares,* not the *mode of collection;* the protection of the traveler from excessive demands, not interference with the time, place or mode of payment.  These are mere administrative details, which depend upon varying circumstances, and are, therefore, left to the ordinary course of business management."  As there is no substantial distinction between a charge for transportation and a rate for transportation, the

case cited is in point; and while, of course, it has no binding force here as an authority, it is persuasive because of the learning and ability of the Court which rendered it and because of the force of the reasons given in support of it. It is argued, however, that the point has already been adversely ruled in the case of *Kibler* v. *R. R. Co.*, 64 S. C., 242. I do not think it can fairly be contended that the case decides the point. · In that case the defendant's eighth request to charge was as follows: "The railroad company has the right to impose an excess charge of twenty-five cents upon passengers who fail to buy tickets when opportunity is offered and rebate checks furnished." The request was refused, the trial Judge stating: "I refuse to charge you that, because it is in conflict with the statute law of this State. The statute has defined what they shall charge, and they have no right, under any construction, to charge in excess of that amount." Judge Gary further charges that the railroad company has no right to charge any excess either by rebate check or drawback check or otherwise. Exception was taken to the refusal to charge on the following specifications of error: "(1) The right to impose this excess has been settled upon the former trial of this case by the decision of Judge Izlar, from which there was no appeal. It is the law of the case. (2) The imposition of this excess is not a charge, but a reasonable regulation conducive to the orderly conduct of business, and is valid. (3) The defendant had the right, under the statute of this State and under the regulations of the railroad commissioners offered in evidence, to impose this excess." It cannot be doubted that the question under consideration was presented for the consideration of the Court, but whether it was, in fact, decided, must be determined by the legal effect of the response made by the Court to the exception. I quote all that was said by the Court as follows: "*Third.* The Circuit Judge refused to charge defendant's eighth request, which request is copied in the third exception already quoted in this opinion. The legality of Judge Izar's charge during the first trial in relation to the

right of railroads to charge an excess of twenty-five cents when a person fails to purchase tickets, was not involved in the former appeal in this case. Hence this Court could not and did not pass upon Judge Izlar's charge. It is only where this Court passes upon a question brought before it by exception that our judgment is conclusive upon parties to a cause in a second or new trial. 4. We think Judge Gary was right in refusing to charge the eighth request of defendant. But whether he was right or wrong in such declaration of the law, it will not affect this case, for the reason that defendant railroad had no tickets for sale at its agency in Newberry for less than ten cents. Its own agent testified that he would not have sold the plaintiff a ticket from Newberry to Helena for *three cents,* or rather for any amount less than ten cents. This being so, such ruling was not necessary in this cause; it became an abstract question of law. The ruling, as before said, whether right or wrong, did not affect this case. So, therefore, subdivisions (1) (2) (3) of the third exception do not fairly arise upon the record, and are, therefore, overruled." The point we have been discussing was embraced in second and third specifications above; but the Court expressly said those matters did not fairly arise upon the record and were, *therefore,* dismissed. This manifestly was not a decision of the question now under consideration. It is true, the writer of that opinion said: "We think Judge Gary was right in refusing to charge the eighth request;" but if that statement needs to be reconciled with what follows, it may easily be done, for clearly, in the opinion of the Court, the request to charge stated an abstract proposition of law not applicable to the undisputed facts in the case, and, therefore, was properly refused. For these reasons, I think the judgment of the Circuit Court should be affirmed.